AMY JANE LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
YOLANDA OCHOA (Cal. Bar No. 267993)
Email: ochoay@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine Zoladz, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TELLONE MANAGEMENT GROUP, INC.; DEAN TELLONE; STEVEN WOLFE; AND ROBERT GUMERMAN,<br><br>Defendants. | Case No. 21-cv-1413<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the

Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 90b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Dean Tellone and Steven Wolfe reside in this District, and Defendant Tellone Management Group, Inc. has its principal place of business in this District.

## SUMMARY

4.     This civil enforcement action involves fraudulent misconduct and breaches of fiduciary duty by Defendant Dean Tellone and the investment advisory firm he founded, solely owns, and controls, Tellone Management Group, Inc. ("TMG").  TMG is an SEC-registered investment adviser with approximately $495 million in assets under management ("AUM"), over 500 retail clients, and five pooled investment funds.

5.     From 2015 through the present, Tellone and TMG engaged in a fraudulent scheme and breached their fiduciary duties to TMG's advisory clients and to investors in TMG's largest fund, the "Mortgage Fund."  Tellone and TMG withheld material information from TMG clients/Fund investors and from two successive audit firms, to hide a significant loss in the Mortgage Fund that directly impacted its touted returns on investments.  For years, Tellone concealed a secret side agreement that created an actual conflict of interest between himself and the

Mortgage Fund's investors, many his advisory clients.  Defendant Steven Wolfe, TMG's vice president of investments and then-chief compliance officer ("CCO"), aided and abetted the scheme by knowingly providing misleading information to the Mortgage Fund's auditors.

6.     In 2015, the Mortgage Fund's financial statements were audited for the first time.  When the auditors inquired about the valuation of a $1 million loan for which payment had not been received for several years, Tellone and Wolfe misled the auditors about the loan's status.  The loan had been issued to Tellone's decades-long friend, Defendant Robert Gumerman, and his wife, through their family trust.  The loan was discharged and its collateral foreclosed upon in the Gumermans' personal bankruptcy proceeding in 2012.  Tellone took a series of steps to distort the status of the discharged loan, in an attempt to hide the substantial decrease to the Mortgage Fund's rate of return for fiscal year 2014 that would have resulted from writing off the Gumerman loan.  Tellone also directed Gumerman to falsely confirm to the auditors that the loan was still outstanding.  He and Wolfe then presented the auditors with a backdated letter from Gumerman that falsely implied that the discharged loan was collateralized.

7.     As a result of the scheme, the Mortgage Fund's financial statements provided to investors falsely reported a 3.1% return on investment for 2014.  Had the bankruptcy discharge been disclosed and the loan written down accordingly, the Mortgage Fund would have instead reported a 1.6% return.

8.     To induce Gumerman to continue to help with his deception, Tellone then had the Mortgage Fund issue the family trust a new $1 million loan to buy an apartment building of equal value, while the parties purported to modify the discharged loan to a zero-interest, no-maturity loan and re-collateralize it by a second mortgage deed on the apartment building.

9.     But in a side agreement that Tellone concealed from the auditors, the Mortgage Fund's loan files, and TMG's compliance personnel, Tellone agreed to

personally guarantee the new loan; to indemnify and reimburse the Gumermans for the discharged loan expenses; and, upon the sale of the apartment building, to write off the balance of the discharged loan and split the profits between the Gumermans and the Mortgage Fund in contravention of the written terms of the loan— namely, that if and when the borrower sells the property, the entire debt is due.

10.     Tellone and TMG failed to disclose that, through the side agreement, Tellone put his interests in conflict with those of the Mortgage Fund investors/TMG's clients.  The Mortgage Fund's financial statements from 2015-2019 never disclosed the side agreement—nor the conflict of interest.  In addition, the Mortgage Fund's offering documents and TMG's relevant Forms ADV never disclosed the conflict of interest posed by the side agreement with Gumerman.  TMG continued to collect its management fees on the discharged loan, which remained on its balance sheet, amounting to over $110,000 from at least 2012 through 2020.  By collecting the fees on the discharged loan and issuing a new $1 million loan to Gumerman in furtherance of the scheme, Tellone and TMG misused the Mortgage Fund's assets, operating as a fraud on the Mortgage Fund.  Throughout, TMG lacked—and continues to lack— compliance policies and procedures reasonably designed to prevent such breaches of fiduciary duty.

11.     By their conduct:  (1) Defendants Tellone and TMG violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; Section 17(a) of the Securities Act; and Sections 206(1)-(2) and 207 of the Advisers Act; (2) Defendant Wolfe aided and abetted TMG's and Tellone's violations of Section 10(b) and Rule 10b-5 thereunder; Section 17(a) of the Securities Act; and Sections 206(1)-(2) of the Advisers Act; (3) Defendant Gumerman violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder and Section 17(a)(1) and (3) of the Securities Act; (4) Defendant TMG violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder; and (5) Defendant Tellone aided and abetted TMG's violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

12.     The SEC seeks findings that the Defendants committed these violations; permanent injunctions against all Defendants; and from Defendants TMG and Tellone, disgorgement with prejudgment interest and civil penalties.

## **THE DEFENDANTS**

13.     **Tellone Management Group, Inc.** ("TMG") is a California corporation organized on February 13, 1987, with its principal place of business in Anaheim Hills, California.  TMG has been registered with the SEC as an investment adviser since July 10, 1987.  As of December 31, 2020, TMG reported $494,816,425 in assets under management.  TMG is also the general partner of and investment manager to five pooled investment funds, which are set up as limited partnerships (the "Funds" or "TMG Funds").

14.     On May 5, 2017, the SEC obtained a cease and desist order against TMG for violations of Section 206(2) and Section 207 of the Advisers Act.  TMG was ordered to pay a fine of $75,000.  The order found that TMG allocated profitable day trades in a manner that was sometimes inconsistent with TMG's disclosure to clients, including a practice of allocating day trades with a profit of $300 or less to a single client account while other accounts paid higher prices and bore the risk of this account.

15.     **Dean Tellone** ("Tellone"), age 72, who uses the nickname "Dino," resides in Anaheim Hills, California.  Tellone is the president, founder, and sole owner of TMG.  He is registered as an investment adviser representative in California and Texas.  At all relevant times, Tellone was a member of TMG's loan committee and investment committee.

16.     On May 5, 2017, the SEC obtained a cease and desist order against Tellone for violations of Section 206(2) and Section 207.  The order found that Tellone caused TMG's violations of Section 206(2), and willfully violated Section 207.  Tellone was censured and ordered to cease and desist from future violations and pay a fine of $25,000.

17.   **Steven Wolfe** ("Wolfe"), age 51, resides in Tustin, California.  Wolfe is the vice president of investments at TMG.  Wolfe has been associated with TMG since at least 1995 and was the CCO of TMG from 2006 through 2017.  At all relevant times, Wolfe was a member of TMG's loan committee, investment committee, and its compliance committee.

18.   **Robert Gumerman** ("Gumerman"), age 78, resides in Sagle, Idaho.  He has been Tellone's friend for over 40 years.  He and his wife are trustees of the Gumerman Family Trust UTD April 2003 (the "Gumerman Family Trust") and through this trust, have sought and been approved for multiple loans issued by the TMG Funds.

### **RELATED PERSONS**

19.   **Tellone Mortgage Fund, LP** (the "Mortgage Fund") is a California limited partnership, formed in April 1997.  TMG serves as investment manager and General Partner of the Mortgage Fund.  The Mortgage Fund primarily invests in mortgage loans secured by real property and other forms of collateral.  The Mortgage Fund reported $106,596,075 in net assets as of December 31, 2020.  From 2014 through 2019, the Mortgage Fund's assets have ranged from approximately $64 million to $101 million.

20.   **Tellone Financial Services, Inc.** ("Tellone Financial Services") is a related party to TMG.  Tellone Financial Services provides accounting, financial planning and tax services for TMG, and its employees are affiliated with TMG.  Tellone is the president and sole owner of Tellone Financial Services, and Wolfe is a vice president.

21.   **Accounting Firm A** was a public accounting firm.  Accounting Firm A audited the Mortgage Fund's 2014 financial statements.

22.   **Accounting Firm B** is a public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB").  Accounting Firm B audited the Mortgage Fund's financial statements for fiscal years 2015 through 2017,

and resigned as the TMG Funds' auditor in November 2018.

23.     **Accounting Firm C** is a public accounting firm registered with the PCAOB.  Accounting Firm C audited the Mortgage Fund's financial statements for fiscal years 2018 through 2020.

## THE ALLEGATIONS

**A.     TMG and the Mortgage Fund**

24.     In 1987, Tellone founded TMG and registered it with the SEC as an investment adviser.  As of the end of its fiscal year 2020, TMG reported approximately $495 million in assets under management.  TMG offers investment services to retail clients, and Tellone and TMG provide investment advice to clients.

25.     TMG is also the general partner of and investment manager to the TMG Funds.  The Mortgage Fund is the largest of the TMG Funds.  As of the end of fiscal year 2020, the Mortgage Fund reported approximately $107 million in net assets and over 230 investors.

26.     The majority of the clients invested in the Mortgage Fund are also TMG advisory clients.

27.     TMG's Investment Committee has responsibility for recommending investments for the Mortgage Fund.  Tellone, a member of the Investment Committee, generally determines the investments for the Mortgage Fund.  Through at least early 2020, Tellone has been the final decision-maker when determining whether the Mortgage Fund should issue or modify a loan.

28.     During in-person meetings, by email and by telephone, Tellone, acting on behalf of TMG, personally solicited clients to invest in the Mortgage Fund.

29.     In soliciting investors for the Mortgage Fund, Tellone emphasized the safety of its investments and its consistent returns on investment.

30.     For example, in an August 23, 2017 email to an investor asking about the Mortgage Fund, Tellone wrote: "The fund is very safe, the loans are all first mortgages and have more than 50% equity.  We are currently yielding 3.9% and the

rate should end the year between 4 and 4.6%.  You will make around $35,000 a month on 10 Million... Ps Tellone Mortgage has never lost money.  37 positive years."

31.    As another example, in an August 14, 2017 email to another Mortgage Fund client, Tellone wrote, "Your Tellone Mortgage funds are very safe."

32.    As another example, in an email to a Mortgage Fund investor and TMG client dated May 5, 2016, Tellone assured the client that, as to the Mortgage Fund, "Our conservative lending practices include the requirement of 50% equity in all loans."

**B.    Defendants' Fraudulent Conduct and Breaches of Fiduciary Duties**

    **1.    The Original Gumerman Loan**

33.    The Gumermans, long-time friends of Tellone's, have been clients of Tellone Financial Services since before 2014.

34.    On or about March 16, 2006, the Gumermans, as the trustees of the Gumerman Family Trust, entered into a $1,050,000 loan agreement, titled "Fixed Rate Note Single Advance" with the Mortgage Fund, referred to as Loan #1415-06 in the Mortgage Fund's records.

35.    The Gumermans signed the loan agreement and the related loan documents on behalf of the Gumerman Family Trust, and Tellone signed the loan documents on behalf of TMG, the general partner of the Mortgage Fund.

36.    The loan agreement provided for repayment in monthly installments over approximately five years, or by April 1, 2011, at a rate of 7.01% interest per annum.  The loan was secured by deeds of trust (each, a second lien) on two real properties, located at 2930 Mountain Vista and 1411 N. 23rd Street, Las Vegas, NV (the "Las Vegas properties").

37.    On or about April 28, 2009, another TMG Fund, the Hall Mortgage Fund, issued a second loan to the Gumerman Family Trust, Loan #1529-09, for $466,000.  This loan was secured by second deeds in properties located at 2040 S.

Nautical, Anaheim, CA ("2040 Nautical"), 2065 S. Nautical, Anaheim, CA ("2065 Nautical"), and 3172 Garnet Lane, Fullerton, CA ("Garnet").

38.     On or about July 7, 2010, the Mortgage Fund issued a third loan to the Gumerman Family Trust, Loan #1570-10, for $395,000.  This loan was secured by a first deed in 2065 Nautical.

### 2.     TMG Fails to Account for the Gumerman Loan

39.     By sometime in 2010, the Gumermans had ceased making payments on Loan #1415-06.

40.     On or about January 11, 2011, the Gumermans filed a voluntary Chapter 11 petition in the U.S. Bankruptcy Court for the Central District of California, *In re Robert Clark Gumerman and Carolyn Gumerman*, Case No. Case 8:11-BK-10500-ES.

41.     On or about November 21, 2011, the Gumermans filed a Chapter 11 reorganization plan.  After a hearing, the Bankruptcy Court entered a confirmation order on February 16, 2012.

42.     According to the reorganization plan, the Gumermans were ordered to pay holders of general unsecured claims (including the Mortgage Fund) a pro rata share of their projected disposable income for the next five years (through 2017).

43.     For the Mortgage Fund, the repayment obligation on Loan #1415-06 amounted to approximately 5% of the outstanding loan balance, or approximately $50,000, to be paid over the five year period.

44.     The Gumermans did not make any payments on Loan #1415-06 to the Mortgage Fund per the reorganization plan.

45.     In or about April 2012, the Las Vegas properties securing Loan #1415-06 were foreclosed upon by the senior lender.

46.     Gumerman notified Tellone by email on or about March 1, 2012 that the properties would be sold by the senior lender at a trustee sale.

47.     On or about August 4, 2012, the Bankruptcy Court granted the

Gumermans' motion for a discharge, based on a finding that the reorganization plan had been substantially consummated. The Court's discharge of the Gumermans' debt was entered by the clerk on December 21, 2012.

48. The Mortgage Fund, along with the Gumermans' other unsecured creditors, was on the service list for the motion to discharge. Neither TMG, Tellone nor the Mortgage Fund objected to the motion to discharge or otherwise sought to prevent Loan #1415-06 from being discharged in the bankruptcy proceeding.

49. There were no further payments made by the Gumermans on Loan #1415-06 following the bankruptcy.

### 3. Defendants Deceive Accounting Firm A about Loan #1415-06

50. The TMG Funds' financial statements were audited for the first time in 2015, based on a requirement from the brokerage firm that served as the Funds' custodian.

51. TMG retained Accounting Firm A to audit the TMG Funds' financial statements for the fiscal year 2014, ending December 31, 2014.

52. Wolfe served as one of TMG's primary points of contact for Accounting Firm A's audit.

53. At the time of the audit, Tellone knew that Loan #1415-6 had been discharged in bankruptcy and that the collateral for Loan #1415-06 had been foreclosed upon by the senior lender in the course of the bankruptcy proceedings.

54. At the time of the audit, Wolfe knew that the collateral for Loan #1415-06 had been foreclosed upon by the senior lender.

55. For example, in an email dated October 17, 2014 from Gumerman to Tellone, Gumerman referred to the loan as "the loan I had that was discharged by the Bankruptcy Court."

56. Tellone's email to Gumerman in response, dated October 20, 2014, did not take issue with the statement that the loan had been discharged.

57. Neither TMG, Tellone nor Wolfe informed Accounting Firm A at the

time of the fiscal year 2014 audit that Loan #1415-06 had been discharged nor its collateral foreclosed.

58.     Neither TMG, Tellone nor Wolfe informed Accounting Firm A at the time of the fiscal year 2014 audit that the Gumerman Family Trust no longer had any legal obligation to repay Loan #1415-06.

59.     Instead, TMG, Tellone, and Wolfe took affirmative steps to mislead Accounting Firm A into believing that Loan #1415-06 continued to have a value of close to $1 million.

60.     As part of Accounting Firm A's audit, Accounting Firm A sent confirmation letters dated March 3, 2015 to a sample of the Mortgage Fund's borrowers, including the Gumermans, requesting that they provide written confirmation directly to the auditors of the amounts owed on their loans.

61.     After receiving the confirmation letter, Gumerman, in an email to Tellone dated March 11, 2015 titled "Auditors Questions," asked Tellone, "How do you want me to handle this."  Gumerman's email noted that the loan was "dismissed by the Bankruptcy Court."

62.     Tellone responded the same day to Gumerman's email, stating:  "Yes **we need to tell the auditors you still owe it** and we are restructuring it with your properties" (emphasis added).

63.     Tellone, on behalf of TMG, thus directed Gumerman to provide false information to Accounting Firm A.

64.     After his email exchange with Tellone, on or about March 20, 2015, Gumerman signed and returned the confirmation letter to Accounting Firm A, falsely representing that the loan balance for Loan #1415-06 was $995,202.73 as of December 31, 2014.

65.     On or about April 1, 2015, Wolfe emailed Accounting Firm A the list of loan roll-forwards for the Mortgage Fund, which included a loan balance for Loan #1415-06 of $995,202.73.

66.     The information Wolfe provided Accounting Firm A was false, because the loan had been discharged and had no collateral.

67.     On or about June 4, 2015, Wolfe corresponded by email with a bookkeeping consultant retained by TMG to help the Mortgage Fund prepare financial statements for Accounting Firm A's review.  Wolfe wrote to the consultant that, "[The] Gumerman loan is currently being restructured to bring the loan current. The loan is secured by multiple properties to provide equity on the loan.  This is favorable and provides the basis for restructure."

68.     Wolfe's statement was false, because the loan had been discharged and had no collateral.

69.     On or about September 11, 2015, an auditor from Accounting Firm A emailed Tellone, Wolfe and others a list of open items on the Mortgage Fund's audit. Regarding Loan #1415-06, the auditor asked, "Loan Valuation - Gumerman loan - what is status of this? Was modification and restructure finalized?  Are they current now?  What is value of underlying property?"

70.     In response to the auditor's question, Tellone, Gumerman and Wolfe provided a backdated letter from Gumerman to Tellone/the Mortgage Fund, purporting to show that as of June 2015, the Gumerman loan was secured by Garnet and 2065 Nautical.

71.     On or about September 14, 2015, Tellone's assistant provided him by email a draft of the letter, on Tellone Financial Services, Inc. letterhead, from Tellone to Gumerman, with a backdated date of "September _ 2014."

72.     The draft letter stated, "This letter will summarize our agreement to work with you on the restructuring of your loans currently held by us.  The following is a breakdown of the collateral pledged as security for our three (3) loans to you (Tellone Mortgage Fund, LP loan No. 1415-06, Tellone Mortgage Fund, LP Loan No. 1570-10, and Hall Mortgage Fund, LP Loan No. 1527-09)."

73.     The draft letter identified as collateral for the three loans Garnet and

2065 Nautical.

74.    The draft letter also stated, "Additionally, as agreed and as part of your restructure, we will lend on one (1) additional property, which you are in the process of purchasing to further collateralize these loans."

75.    As of September 2015, Garnet and 2065 Nautical did not in fact secure Loan #1415-06.

76.    As of September 2015, Loan #1415-06 had been discharged in bankruptcy and its collateral foreclosed upon, more than three years earlier.

77.    On or about September 15, 2015, Wolfe, at Tellone's request, provided Tellone by email a revised draft of the letter.

78.    The revised draft, instead of being on Tellone Financial Services letterhead, was from Gumerman to the Mortgage Fund, with a backdated date of June 25, 2015, and stated: "This letter will summarize our intent to work with you on the restructuring of our loan currently outstanding in your private fund. Below we have outlined the remaining debt and collateral to show the sufficient equity provided by our properties," identifying Garnet and 2065 Nautical.

79.    The revised draft no longer stated that Garnet and 2065 Nautical secured *other* loans to Gumerman, nor referenced the Gumermans' potential future purchase of another property.

80.    On or about the evening of September 15, 2015, Gumerman returned the revised letter with ministerial edits, executed backdated to June 25, 2015, to Tellone, who then forwarded it on to Wolfe.

81.    For a second time, Gumerman was thus asked to and did provide false information to Accounting Firm A, this time by Tellone and Wolfe on behalf of TMG.

82.    Later that same evening, Wolfe responded by email to the auditor's question on the Gumerman loan, attaching the executed letter, and stating that, "This loan is scheduled to be restructured soon. The borrower provided a letter of intent to

do so and will be back in town soon (see attached). There are two properties to collateralize the loan with an estimated value of $1,900,000. The borrower also signed the loan confirmation indicating the balance due."

83.     The same night, Tellone emailed Gumerman an "Acknowledgement," stating, "This email is to acknowledge the collateral for loan number 1415-06 was foreclose[d] on by [the senior lender] on your two Las Vegas properties. We appreciated you working with us on a longer term solution and restructure and the potential write off over 4 years. It is too bad we could not get Valley Vista apartments restructure. I like your new idea of 75% 25% on a new property I think that would be a win[-]win situation."

84.     The Acknowledgement was not provided to Accounting Firm A.

85.     On or about September 16, 2015, the auditor from Accounting Firm A by email asked Wolfe, Tellone and others for support for the value of the collateral for Loan #1415-06.

86.     Wolfe responded by email the same day, providing valuations of Garnet and 2065 Nautical from a real estate website.

87.     On or about October 16, 2015, Tellone and Wolfe signed a management representation letter to Accounting Firm A on behalf of TMG.

88.     The management representation letter contained several false statements, including:

        (a)     Falsely representing that management had provided the auditors with access to all relevant information;

        (b)     Falsely certifying that all transactions were recorded in the accounting records and were reflected in the financial statements; and

        (c)     Falsely stating that there were no indicia of fraud.

89.     These statements were false because: TMG did not provide the auditor any information about the Gumerman's bankruptcy and its impact on Loan #1415-06, and the accounting records did not reflect that the loan was discharged or that its

collateral was foreclosed upon.

90.     According to Accounting Firm A's workpapers, the firm relied on the backdated letter and the information provided by Wolfe to conclude that no impairment to the value of Loan #1415-06 was needed for the Mortgage Fund's 2014 financial statements.

91.     Accounting Firm A also relied on the management representation letter for the fiscal year 2014 audit.

92.     Had Accounting Firm A been provided the information on the loan's true status as of the audit, the loan would have been assessed for impairment and the recommendation made to write off the loan.  Instead, Loan #1415-06 was valued at almost $1 million in the Mortgage Fund's 2014 financial statements.

93.     Based on the inclusion of the Gumerman loan, the Mortgage Fund's 2014 financial statements falsely reported a 3.11% return on investment for the year. Had Loan #1415-06 been written off, the Mortgage Fund's net investment income of $2.3 million for 2014 would have been reduced by more than 40% (*i.e.*, to $1.3 million); and the Mortgage Fund's rate of return for 2014 would have been reduced from 3.1% to 1.6%.

### 4.     Tellone's Subsequent Side Deal with Gumerman

94.     On or about December 10, 2015, Tellone entered into three agreements with the Gumerman Family Trust, involving two mortgage agreements with the Mortgage Fund and a side agreement between Tellone and the Gumermans.

95.     Tellone was personally involved in drafting and reviewing each of the three agreements.

96.     In the first loan agreement (the "new loan"), Tellone had the Mortgage Fund issue a $1,030,000 loan to the Gumerman Family Trust to cover the full purchase price of an apartment building at 1420 Eastpark Drive, La Habra CA ("1420 Eastpark").  In turn, the Gumermans, on behalf of their family trust, executed a promissory note designated as Loan #1791-15, for $1,030,000.00.

97.    According to the new loan agreement, Loan #1791-15 was secured by a first deed of trust in 1420 Eastpark, and by third deeds on Garnet Lane and 2065 Nautical.  Loan #1791-15 provided for repayment in monthly installments over approximately five years, or by April 1, 2021, at a rate of 4% interest per annum amortized over 40 years.

98.    In the second mortgage agreement, the Gumermans, on behalf of their family trust, executed a promissory note titled "Fixed Rate Note Single Advance," designated as Loan #1415x-06.

99.    Loan #1415x-06 purportedly restructured the Gumermans' discharged loan #1415-06, with a balance of $995,203 and accrued interest of $73,700 as of December 31, 2014, discharged in bankruptcy in 2012.

100.    The purportedly restructured note was for a zero-interest (principal-only) loan of $1,068,903 ($995,203+$73,700), with no maturity date.  According to the restructured loan agreement, Loan #1415x-06 was secured by a second deed of trust on 1420 Eastpark; however, the amount secured by the first deed of trust (in the amount of $1,030,000) already exceeded the purchase price for the property ($995,000).

101.    Tellone's restructured loan agreement forgave the outstanding interest and late fees the Gumermans previously owed on Loan #1415-06.

102.    Loan #1415x-06 provided for monthly payments by the Gumermans of at least $1,000/month, with no end date.  At $1,000/month, it would take the Gumermans approximately 89 years to pay off Loan #1415x-06.

103.    In the third agreement, Tellone and the Gumermans executed a notarized side agreement titled, "Proposed Deal Points in an Agreement between Dino Tellone and the Gumerman Family Trust related to the purchase of 1420 Eastpark, La Habra."

104.    Tellone executed the side agreement in his personal capacity, and the Gumermans executed the side agreement on behalf of their family trust.

105.    This secret side agreement rendered the first two December 10, 2015

mortgage agreements a sham transaction.

106.   The side agreement recited that the Mortgage Fund was making a loan to the Gumerman Family Trust for the full purchase price of 1420 Eastpark, plus closing costs, plus a reserve fund of $26,000.

107.   Pursuant to the side agreement, Tellone secretly agreed to personally guarantee the first mortgage/new loan, Loan #1791-15.

108.   Specifically, the side agreement provided that:  "Dino Tellone agrees to personally guarantee the above referenced loan when the property is sold, if the net proceeds from the sale are less than the remaining principal balance of the first mortgage, Dino will make up the difference to [the Gumerman Family Trust].  As a part of this first mortgage requirement, [the Gumerman Family Trust] agrees to give [the Mortgage Fund] a second trust deed on property located at 3172 Garnet, Fullerton and 2065 Nautical, Anaheim.  The purpose of these Second Trust Deeds is to secure the First Trust Deed on 1420 Eastpark, which Dino is personally guaranteeing any shortfall on the sale."

109.   The side agreement provided that the $1,000/month payments due on Loan #1415x-06 would come from the rents generated by 1420 Eastpark, and that Tellone would reimburse the Gumermans for any monthly shortfall.

110.   The side agreement also provided that, upon the close of escrow on 1420 Eastpark and at no cost to the Gumermans, the Gumerman Family Trust's outstanding loans secured by Garnet and 2065 Nautical (Loan #1570-10 and Loan #1527-09) would have their interest rates reduced to 5.6% effective January 1, 2016, and that each loan would have its term extended by 5 years.

111.   The side agreement provided that the Gumerman Family Trust's second mortgage on 1420 Eastpark would not be secured by the properties at Garnet and 2065 Nautical, contrary to what Tellone and Wolfe had represented to Accounting Firm A.

112.   The side agreement provided that Tellone would indemnify the

Gumerman Family Trust for any legal expenses related to Loan #1415x-06.

113.   The side agreement provided that when 1420 Eastpark was sold, any remaining proceeds of the sale (after the first mortgage, Loan #1791-15, was paid off) would be split between the Gumermans and the Mortgage Fund and the remaining balance of the second mortgage, restructured Loan #1415x-06, would be written off.

114.   The side agreement recited that there is "no association between the property purchase and this Agreement with any other loans between the Parties or Bankruptcy Court Case No. 8:11-bk-10500-ES."

115.   By the side agreement, Tellone secretly made the combined terms of the three agreements more favorable to the Gumermans, and less favorable to the Mortgage Fund and its other investors, most of whom were or at some point had been TMG advisory clients.

116.   By the side agreement, Tellone agreed that the Mortgage Fund would: (1) nominally provide two loans totaling approximately $2.1 million for the purchase of a property worth only $1 million, but only really fund the first loan ; (2) not receive any interest on the restructured second loan; and (3) allow the Gumermans to repay the first loan and keep half the profit from the sale of the property, while not repaying the second loan, in contravention of the loan's written terms, while the Mortgage Fund would write off the unpaid second loan as a loss.

117.   Tellone's side agreement created an actual conflict of interest between Tellone and the Mortgage Fund and put his personal interests in conflict with the Mortgage Fund and its investors' interests.

118.   For example, if the Gumermans were to default, Tellone's personal guarantee and agreements to indemnify and reimburse the Gumermans incentivized him to avoid legal and collection remedies on behalf of the Mortgage Fund.

119.   Through these three agreements, Tellone continued to maintain the false appearance that Loan #1415-06 remained outstanding, with modifications.

120.   However, Loan #1415-06 could not have been modified in 2015 because

it had been discharged in bankruptcy in 2012.

121.   The Gumermans had no legal obligation to pay the Mortgage Fund anything on Loan #1415-06 after 2012, notwithstanding any new obligations to pay the Mortgage Fund on Loan #1415x-06 after December 2015.

122.   Tellone and Gumerman took active steps to conceal their side agreement.

123.   Unlike the Funds' other agreements with the Gumermans, Tellone did not maintain a copy of the side agreement in the TMG loan files for the Gumermans.

124.   Tellone did not provide Wolfe or his successor as TMG's CCO a copy of the side agreement.

125.   Tellone told Gumerman to keep the side agreement private between him and Tellone.

126.   Tellone and Gumerman agreed not to exchange emails concerning the side agreement.

127.   The Gumermans first began making monthly payments to the Mortgage Fund on Loan #1415x-06 in January 2016.

### 5.   Tellone Conceals the Side Agreement from Accounting Firm B

128.   In or about mid-2015, Tellone reached out to Accounting Firm B, to replace Accounting Firm A as the Funds' auditors.

129.   Accounting Firm B audited the Funds for fiscal years 2015 through 2017.

130.   Tellone did not provide Accounting Firm B with a copy of the side agreement, or otherwise disclose its effect on the December 2015 mortgage agreements with the Gumermans, during the performance of the Firm's audits.

131.   Accounting Firm B was never advised by Tellone that the side agreement called for Loan #1415x-06 to be written off once the property was sold, and the sales proceeds split with the Gumermans.

132.   Accounting Firm B was never advised that Tellone personally

guaranteed Loan #1791-15 or that Tellone agreed to reimburse and indemnify the Gumermans for expenses related to Loan #1415x-06.

133.   Accounting Firm B was never advised that Loan #1415-06 had been discharged in bankruptcy several years prior to 2015.

134.   Accounting Firm B was never advised that the collateral for Loan #1415-06 had been foreclosed upon several years prior to 2015.

135.   Tellone, on behalf of TMG, signed management representation letters to Accounting Firm B dated June 9, 2016 (for the 2015 audit); April 27, 2017 (for the 2016 audit); and April 30, 2018 (for the 2017 audit).

136.   Tellone knew that the management representation letters for the 2015-2017 audits contained false statements.  For example, the letters:

(a)   Falsely stated that all related party transactions had been accounted for and disclosed;

(b)   Falsely stated that Accounting Firm B had been provided with access to all information relevant to the preparation of the financial statements; and

(c)   Falsely stated that there were no indicia of fraud.

137.   Each of these statements was false due to Tellone's secret side agreement with Gumerman and its impact on the other two December 2015 agreements and due to the continued withholding of information concerning the Gumermans' bankruptcy, the discharge of Loan #1415-06, and the foreclosure on its collateral.

138.   Loan #1415-06x remained valued at nearly $1 million dollars on the Mortgage Fund's financial statements for fiscal years 2015 through 2019.

### 6.   The SEC Uncovers the Side Deal

139.   In or about 2018, the SEC's Division of Examinations conducted an examination of TMG.

140.   During the examination, SEC staff located a photo of a portion of the side agreement in an email from Tellone to Gumerman dated December 9, 2015.

141. On or about September 24 2018, the SEC staff issued a deficiency letter to TMG which, among other things, referenced the side agreement.

142. After receiving the deficiency letter, Tellone contacted Gumerman and asked if Gumerman would agree to add the Garnet and 2065 Nautical properties as collateral for Loan #1415x-06.

143. As the reason for his request, Tellone explained to Gumerman that someone was "looking at his books."

144. In a letter to Gumerman dated October 15, 2018, Tellone, without referencing his side agreement, wrote that Garnet and 2065 Nautical "were initially going to secure this loan but were not ultimately added as security in the beginning."

145. On or about October 15, 2018, the Mortgage Fund and the Gumerman Family Trust executed a "Note Modification Agreement," modifying Loan #1415x-06.

146. The Gumermans executed the Note Modification Agreement on behalf of the Gumerman Family Trust, and Tellone executed the Note Modification Agreement on behalf of the Mortgage Fund.

147. The Note Modification Agreement added as collateral for Loan #1415x-06, for the first time, the Garnet and 2065 Nautical properties.

148. From March 2012 through December 2015 there was no collateral securing the Mortgage Fund's Loan #1415-06.

149. From December 2015 through the date of the Note Modification, a second deed of trust on 1420 Eastpark cross-collateralized Loan 1415x-06 to the Gumermans; a first deed of trust on 1420 Eastpark also collateralized Loan 1791-15 for over the full purchase price of the property (*i.e.*, for over $1 million).

150. After receiving a copy of the SEC deficiency letter in or about October 2018, Accounting Firm B resigned as the Funds' auditor, effective November 2018.

151. TMG subsequently retained Accounting Firm C to audit the Funds for fiscal years 2018-2020.

### 7.   Tellone's Pattern of Misleading Disclosures in the Mortgage Fund's Financial Statements

152.   In the Mortgage Fund's 2015-2020 financial statements provided to investors, in furtherance of the scheme and in breach of his and TMG's fiduciary duties, Tellone, through TMG, made a series of misleading statements about the true status of the Gumerman loans.

153.   In a note to its financial statements for fiscal years 2016 and 2017, the Mortgage Fund disclosed for the first time, a loan with special arrangement that bears no interest (referring to the "restructured" loan), but made no reference that it resulted from the restructuring of a loan whose collateral had been foreclosed and the loan discharged in bankruptcy.

154.   After the SEC staff uncovered the side agreement, in a note to its financial statements for fiscal years 2018 and 2019, the Mortgage Fund for the first time discussed the restructuring of the Gumerman loan #1415-06 agreement, but made no reference that it involved issuing a new loan with a related party's personal guarantee.

155.   In a note to its financial statements for fiscal years 2020, the Mortgage Fund for the first time included additional details related to the restructuring of the Gumerman loan #1415-06 agreement, to include collateral information and reference to the bankruptcy proceedings.

156.   The 2020 financial statements disclose that the Gumermans initiated bankruptcy proceedings; that the initial loan was "restructured" with "substituted" collateral; and that Tellone agreed to personally reimburse the Gumermans for any shortfall on the sale.

157.   However, the 2020 financial statements do not reveal that the original Gumerman loan was discharged in bankruptcy; do not disclose that the restructuring of Loan #1415-06 involved the issuing of a new loan that was personally guaranteed by Tellone (*i.e.*, Loan #1791-15); do not include information regarding Loan #1791-

15 issued for the purchase of 1420 Eastpark identified as collateral for the restructured loan; do not identify Loan #1791-15 as a related party loan; and still do not identify the full import of Tellone's side agreement.

158.   TMG has collected management fees of over $110,000 for managing the Gumerman loans, despite the original loan being discharged and the side agreement making the "restructured" loan a sham transaction.

159.   The Mortgage Fund continued to carry Loan #1415-06x at a value of $1,008,903 as of 12/31/2020.

**C.    Defendants' Materially False and Misleading Disclosures**

160.   The agreements with Gumerman resulted in TMG and Tellone making false and misleading disclosures to Mortgage Fund investors and TMG clients including in the Mortgage Fund's 2014, 2015 and 2020 financial statements; the Mortgage Fund's offering memoranda during the relevant period; and TMG's Forms ADV filed with the SEC.

161.   As the Funds' general partner, TMG is the maker of the statements in the Mortgage Fund's offering memoranda and financial statements.

162.   As TMG's principal manager and sole owner, Tellone is also the maker of statements in the Mortgage Fund's offering memoranda and financial statements.

**1.    The Fund's materially false financial statements**

163.   Due to the true status of the Gumerman agreements, the Mortgage Fund's financial statements for fiscal year 2014 were materially false and misleading.

164.   The Mortgage Fund's financial statements were provided to the Mortgage Fund investors by TMG.

165.   The Fund's 2014 financial statements reflected Loan #1415-06 as having a value of approximately $1 million, even though it had been discharged in bankruptcy.

166.   Based on the inclusion of the Gumerman loan, the Mortgage Fund's 2014 financial statements falsely reported, in a note to the financial statements, a

3.11% return on investment.

167.   Had the Gumerman loan been written off, the Mortgage Fund's net investment income of $2.3 million for 2014 would have been reduced by more than 40% (i.e., to $1.3 million); and the Mortgage Fund's rate of return for 2014 would have been nearly halved, down from 3.1% to 1.6%.

168.   It would have been important to a reasonable Mortgage Fund investor/TMG advisory client to know that the Mortgage Fund's net income and return on investment were significantly overstated.

169.   Additionally, based on the status of Loan #1415-06 as of the end of fiscal year 2014, the 2014 financial statements were misleading in their depiction of impaired loans.

170.   Note 2 to the 2014 financial statements states that "Interest income on loans is discontinued at the time the loan is ninety days delinquent unless the loan is well-secured and in the process of collection.  Loans are charged off on a case by case basis at such time that management determines the loan to be uncollectible.  Past due status of loans is based on the contractual terms of the loan.  In all cases, loans are placed on nonaccrual or charged-off at an earlier date if collection of principal or interest in considered doubtful."

171.   Note 3 to the Mortgage Fund's 2014 financial statements identified Loan #1415-06 (without listing the loan number) as being in the "special mention risk category," which was defined as loans where the "repayment ability has been compromised, but borrower is viable and working its way out with limited collateral risk."

172.   Note 3 included three categories for loans with greater impairment than special mention:  (1) "substandard," which were loans past due more than ninety days, with no immediate plans to correct the deficiency; (2) "non-accrual," which were loans that were past due more than ninety days with a possibility of foreclosure, and full collectability in doubt due to the inadequacy of the value of the collateral and

(3) "loss," which were loans considered uncollectible.

173.   Categorizing Loan #1415-06 as "special mention" rather than "non-accrual" or "loss" was materially misleading because:

(a)   zero payments had been received on the loan for the several preceding years, from 2011 through 2014;

(b)   the collateral for the loan had been foreclosed several years prior, in 2012, yet no new collateral secured the loan as of the end of fiscal year 2014; and

(c)   the loan had been discharged in bankruptcy several years prior, in 2012.

174.   It would have been important to a reasonable Mortgage Fund investor/TMG advisory client to know that the one loan described as "special mention" was a far riskier an investment than portrayed.

## 2.   The Fund's materially false and misleading offering memoranda

175.   TMG solicited investors to invest in the Mortgage Fund using offering memoranda.

176.   The offering memoranda were reviewed by Tellone and Wolfe before they were provided to investors.

177.   Tellone and Wolfe provided, or otherwise made available, copies of the offering memoranda for advisory clients, investors, and prospective investors.

178.   Between 2014-2016, the Mortgage Fund used an offering memorandum dated July 1, 2014.

179.   The July 2014 offering memorandum merely stated that TMG would "endeavor to ensure that any conflicts of interest are resolved fairly."

180.   It did not disclose any potential or actual conflicts arising from transactions with related parties.

181.   It did not disclose any potential conflicts arising from secret side agreements between TMG or its principal and the Mortgage Fund's mortgagees.

182.   The July 2014 offering memorandum did not disclose that Tellone had an actual conflict of interest arising from the side agreement with Gumerman.

183.   Between 2016-2018, the Mortgage Fund used an offering memorandum dated January 2016.

184.   Like the July 2014 offering memorandum, the January 2016 memorandum merely stated that TMG would "endeavor to ensure that any conflicts of interest are resolved fairly."

185.   The January 2016 memorandum did not disclose any potential or actual conflicts arising from transactions with related parties.

186.   The January 2016 memorandum did not disclose any potential conflicts arising from secret side agreements between TMG or its principal and the Mortgage Fund's mortgagees.

187.   The January 2016 offering memorandum did not disclose that Tellone had an actual conflict of interest arising from the side agreement with Gumerman.

188.   It would have been important to a reasonable Mortgage Fund investor and/or TMG client to know that Tellone had made a side agreement with Gumerman that altered the terms of the loans as recorded in TMG's books, creating a conflict of interest between Tellone and the Mortgage Fund investors.

189.   In January 2019, the Mortgage Fund updated its offering memorandum.

190.   The 2019 offering memorandum states that the Mortgage Fund "has in the past and may in the future" enter transactions with "Tellone Parties."

191.   "Tellone Parties" are defined as including, among others, anyone at TMG, their affiliates, or persons with a family or business relationship with a TMG employee.

192.   The 2019 offering memorandum states that TMG "may have incentive to provide favorable terms to a Tellone party" and that the Mortgage Fund's interests may be at odds with those of the Tellone Parties.

### 3.  TMG's Materially False and Misleading Forms ADV

193.  TMG filed Forms ADV with the SEC for 2015 through 2018.

194.  TMG's Forms ADV failed to disclose adequately the conflict of interest between TMG clients/Fund investors and Tellone, due to Tellone's side agreement with the Gumermans.  As a result, TMG breached its fiduciary duty to its clients.

195.  The 2015-2018 Forms ADV stated that TMG would engage in "ethical handling of actual or apparent conflicts of interest."

196.  The 2015-2018 Forms ADV did not disclose any potential conflicts of interest regarding the Funds.

197.  The 2015-2018 Forms ADV did not state that TMG or Tellone had any actual conflicts of interest arising from the side agreement with Gumerman.

198.  As president, founder, and sole owner of TMG, Tellone had ultimate authority and control over the content of TMG's Forms ADV.

199.  Tellone signed TMG's Forms ADV Part 1A that were filed with the SEC in 2014 through 2018.

200.  It would have been important to a reasonable Mortgage Fund investor and/or TMG client to know that an actual conflict of interest existed due to Tellone's side agreement with Gumerman.

201.  It would have been important to a reasonable Mortgage Fund investor and/or TMG client to know that Tellone had made a secret side agreement with Gumerman that altered the terms of the loans as recorded in TMG's books, creating a conflict of interest between Tellone and the Mortgage Fund investors.

### D.  The Limited Partnership Interests in the Funds Are Securities

202.  Investor funds were pooled in the Funds to finance TMG's investment activities, including the Mortgage Fund's lending activities.

203.  The investors in the Mortgage Fund were dependent on the success of the underlying mortgages to generate their returns, while TMG's management fees were directly tied to the returns on the investments.

204.   Tellone, as 100% owner of TMG, in turn received money from TMG that was derived from the fees TMG collected from the Mortgage Fund.

205.   The efforts of TMG and Tellone in managing the Mortgage Fund's mortgage investments were critical to the Fund's success, as the investors in the Mortgage Fund did not play any role in managing TMG's investment decisions.

**E.   Tellone and TMG are Investment Advisers**

206.   TMG was an investment adviser registered with the SEC and was at all relevant times acting as an adviser to the Funds.

207.   At all relevant times, Tellone was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11), as he was engaged in the business of providing investment advice as to the value of securities and as to the advisability of investing in, purchasing and selling securities.

208.   In the relevant period, Tellone was also an investment adviser due to his ownership, management, and control of TMG, including his ultimate authority over all aspects of TMG's business.

209.   Tellone was ultimately responsible for the overall investment strategy of the Funds, including the Mortgage Fund.

210.   TMG received an annual asset management fee of 1.25% of the assets in the Mortgage Fund for its management of the Mortgage Fund.

211.   Tellone received compensation for making investment decisions on behalf of the Mortgage Fund because TMG received fees in the form of a percentage of assets managed, portions of which went to Tellone as the 100% owner of TMG.

212.   As investment advisers to the Mortgage Fund, TMG and Tellone owed a fiduciary duty and were prohibited from making untrue statements of material fact or from omitting to state material facts necessary to make their statements not misleading.

213.   Additionally, as investment advisers to TMG's advisory clients, TMG and Tellone owed a fiduciary duty and were prohibited from making untrue

statements of material fact or from omitting to state material facts necessary to make their statements not misleading.

214.   During the relevant period, the majority of the Mortgage Fund investors had a pre-existing, direct investment advisory relationship with TMG and Tellone, via signed advisory agreements with TMG.

**F.    Defendants' Scienter and Negligence**

215.   During the relevant period, Tellone acted with scienter and with negligence, including because:

(a)    Tellone knew or was reckless in not knowing, at the time of the fiscal year 2014 audit, that Loan #1415-06 had been discharged in bankruptcy and its collateral foreclosed upon;

(b)    Tellone knew or was reckless in not knowing that the Mortgage Fund's net income and return on investment would be materially impacted were the Gumerman loan written off in 2014;

(c)    Tellone knew that he represented to potential and actual investors that the Mortgage Fund was safe, with returns over 3%, and well-collateralized loans;

(d)    Tellone asked Gumerman to falsely represent to Accounting Firm A that Loan #1415-06 remained due to the Mortgage Fund;

(e)    Tellone knew, or was reckless in not knowing, at the time of the fiscal year 2014 audit, that the Garnet and 2065 Nautical properties did not secure Loan #1415-06, while representing the contrary to Accounting Firm A;

(f)    Tellone knew or was reckless in not knowing, at the time of the fiscal year 2015-2017 audits, that the side agreement materially impacted the terms of Loan #1415x-06 and Loan #1791-15;

(g)    Tellone knew that by personally guaranteeing Loan #1791-15 and by the agreements he made regarding Loan #1415x-06 in the side agreement, he had an undisclosed conflict of interest with the Mortgage Fund;

(h) Tellone intentionally or recklessly did not maintain a copy of the side agreement in TMG's records and took affirmative steps to conceal its existence;

(i) Tellone intentionally or recklessly did not provide a copy of the side agreement to Accounting Firm B; and

(j) Tellone intentionally or recklessly did not advise Accounting Firm B of the Gumerman bankruptcy nor that the collateral securing Loan #1415-06 had been foreclosed.

216. Alternatively, Tellone did not act with reasonable care.

217. During the relevant period, Wolfe acted with scienter and with negligence, including because:

(a) Wolfe knew or was reckless in not knowing, at the time of the fiscal year 2014 audit, that Loan #1415-06 had been discharged in bankruptcy and its collateral foreclosed upon; and

(b) Wolfe knew, or was reckless in not knowing, at the time of the fiscal year 2014 audit, that the Garnet and Nautical properties did not secure Loan #1415-06, while representing the contrary to Accounting Firm A.

218. Alternatively, Wolfe did not act with reasonable care.

219. Based on their respective roles at TMG, Tellone's and Wolfe's scienter and negligence are imputed to TMG.

220. During the relevant period, Gumerman acted with scienter and with negligence. Gumerman knew, or was reckless in not knowing, at the time of the fiscal year 2014 audit, that Loan #1415-06 had been discharged in bankruptcy and its collateral foreclosed upon, and that the Garnet and 2065 Nautical properties did not secure Loan #1415-06, while representing the contrary to Accounting Firm A. Gumerman entered into the side agreement, which rendered the Gumerman Family Trust's December 2015 mortgage agreements a sham, knowing or recklessly agreeing with Tellone to attempt to conceal its terms. Alternatively, Gumerman did not act

with reasonable care.

### G.    Wolfe's Substantial Assistance

221.   Wolfe provided substantial assistance to Tellone's and TMG's securities laws violations.

222.   Wolfe directly communicated with TMG clients and Fund investors.

223.   Wolfe was one of Accounting Firm A's primary points of contact at TMG.

224.   Knowing that Loan #1415-06 had no collateral because it had been foreclosed upon, Wolfe provided the backdated Gumerman letter to Accounting Firm A.

225.   When asked, Wolfe provided Accounting Firm A false support for collateral purportedly securing Loan #1415-06, though he knew the loan was not secured by Garnet or 2065 Nautical.

226.   Accounting Firm A relied on the backdated letter and supporting documentation in concluding that Loan #1415-06 could continue to appear unimpaired on the Mortgage Fund's 2014 financial statements.

227.   The inclusion of Loan #1415-06 materially inflated the Mortgage Fund's 2014 returns.

228.   But for Wolfe's assistance, Tellone and TMG could not have carried out their securities violations, insofar as they pertained to the deception of Accounting Firm A.

### H.    TMG's Deficient Compliance Policies and Procedures

229.   From at least 2015 through 2017, TMG lacked written compliance policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder in connection with the TMG Funds.

230.   The Form ADV Part 2A brochures that TMG filed with the SEC for 2015 through 2020 stated that TMG's Code of Ethics promotes "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest

between personal and professional relationships."

231.   Tellone signed TMG's Forms ADV that were filed with the SEC throughout this period.

232.   TMG had a Code of Ethics in effect in 2015 which stated that conflicts of interest were "to be avoided, and if unavoidable, must be disclosed to and cleared by the President."

233.   TMG had a Code of Ethics in effect as of January 2016 as part of its Compliance Program Policies & Procedures Manual ("2016 Compliance Manual").

234.   The 2016 Compliance Manual provided that Tellone, as president, would "oversee all activities of the company and maintain final authority to enforce the policies established by [the January 2016 Compliance Manual]," which included the Code of Ethics.

235.   Wolfe, who served as TMG's CCO during 2016, was familiar with and helped to put together the 2016 Compliance Manual.

236.   The 2016 Code of Ethics stated that conflicts of interest were "to be avoided, and if unavoidable, must be disclosed to and cleared by the President."

237.   The 2016 Compliance Manual contained no policies related to how to address, mitigate or disclose actual or potential conflicts of interest related to the TMG Funds.

238.   The 2016 Compliance Manual made no provision for conflicts of interest held by Tellone himself.

239.   TMG adopted a revised Code of Ethics and Compliance Policies and Procedures dated March 17, 2017 ("2017 Compliance Manual").  The 2017 Compliance Manual provided that Tellone, as president, would "oversee all activities of the company and maintain final authority to enforce the policies established by [the 2017 Compliance Manual]."

240.   The 2017 Compliance Manual stated that actual and potential conflicts of interest must be disclosed to the chief compliance officer.

241.   The 2017 Compliance Manual provides that TMG will "Fully disclose material facts concerning the conflict(s) to the client(s)" if a potential conflict cannot be eliminated.

242.   From 2015-2017, TMG's compliance manuals did not address the origination or servicing of loans, or how to mitigate conflicts of interests related to the private funds, or regarding not defrauding the funds.

243.   From 2015-2017, TMG had no written policies and procedures in place requiring TMG to provide advisory clients invested in the Funds with adequate disclosures regarding conflicts of interests and related party loan transactions.

244.   In November 2018, following the SEC examination and deficiency letter, TMG updated its compliance manual ("2018 Compliance Manual").

245.   The 2018 Compliance Manual provides that Tellone, as president, would "oversee all activities of the company and maintain final authority to enforce the policies established by [the 2018 Compliance Manual]."

246.   Tellone received a copy of the 2018 Compliance Manual.

247.   The 2018 Compliance Manual added policies and procedures for evaluating related party loans, for identifying transactions that constitute potential conflicts of interest, and for requiring disclosure of related party transactions to investors through quarterly letters that identify new related party transactions.

248.   The 2018 Compliance Manual, however, addresses prospective conflicts, while lacking policies regarding addressing and disclosing existing conflicts of interest.

249.   To date, Tellone and TMG have failed to disclose adequately the conflicts of interests posed by Tellone's and the Mortgage Fund's transactions with Gumerman.

250.   The quarterly letters that TMG has sent to fund investors to date identifying related party transactions have not disclosed the transactions with the Gumermans.

251.   For example, a January 17, 2020 quarterly letter from Tellone on behalf of the Mortgage Fund discussed two related party loan modifications, but did not mention any of the transactions with Gumerman or Tellone's side agreement with the Gumerman Family Trust.

252.   TMG's policies and procedures remain not reasonably designed to ensure adequate disclosure of related party transactions and conflicts of interest.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendants TMG, Tellone, and Gumerman)**

253.   The SEC realleges and incorporates by reference paragraphs 1-205, and 215-220 above.

254.   Defendants TMG, Tellone and Gumerman, acting with scienter, engaged in a scheme to defraud investors in the Mortgage Fund.  They concealed information from the Mortgage Fund's auditors concerning the Gumermans' bankruptcy and the discharge of the collateral for Loan #1415-06—giving the false impression that the loan was still outstanding for purposes of the Mortgage Fund's fiscal year 2014 audit. After the 2014 audit, Tellone and Gumerman entered a secret side deal that was concealed from the Mortgage Fund's auditors and that materially altered the terms of Loans 1415x-06 and Loan #1791-15, and created a conflict of interest between Tellone and the Mortgage Fund investors, most of whom were TMG advisory clients. Tellone then hid the side agreement from the Mortgage Fund's auditors and made misstatements in the management representation letters for the Mortgage Fund's 2015-2017 audits, continuing to conceal the Gumermans' bankruptcy and the discharge of Loan #1415-06.  TMG continued to collect fees on the discharged loan. Material information about the side agreement was omitted from the Mortgage Fund's 2014 financial statements and the conflict of interest was not adequately disclosed in the Fund's offering memoranda or its Forms ADV.  In furtherance of the

scheme, TMG offered a series of misleading, partial disclosures in the Fund's financial statements from 2015-2019; only when the side letter was discovered during an SEC exam did TMG in 2020 eventually disclose Tellone's conflicted agreement to personally reimburse the Gumermans for certain shortfalls to Fund investors, and even then, the Fund did not disclose all material facts.

255.   By engaging in the conduct described above, Defendants TMG, Tellone and Gumerman, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

256.   Defendants TMG, Tellone and Gumerman, with scienter, employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

257.   By engaging in the conduct described above, Defendants TMG, Tellone and Gumerman violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

### SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against Defendants TMG and Tellone)**

258.   The SEC realleges and incorporates by reference paragraphs 1-205, and 215-219 above.

259.   Defendants TMG and Tellone, acting with scienter, made material misrepresentations to the investors in the Mortgage Fund, in the Mortgage Fund's

financial statements, its offering memoranda, and its Forms ADV.  In the Mortgage Fund's 2014 financial statements, TMG overstated its net income and its return on investment more than 40% by including income on Loan #1415-06, which several years prior had gone delinquent; then been discharged in bankruptcy; and had its collateral foreclosed on.  Material information about the side agreement was omitted from, and the conflict of interest not adequately disclosed in, the Mortgage Fund's offering memoranda or its Forms ADV.  As TMG's president, founder, and sole owner, Tellone had ultimate authority for TMG's disclosures to its investors and TMG's advisory clients.

260.   By engaging in the conduct described above, Defendants TMG and Tellone, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

261.   Defendants TMG and Tellone, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, by the conduct described in detail above.

262.   By engaging in the conduct described above, TMG and Tellone violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) and (3) of the Securities Act**

**(against Defendants TMG, Tellone and Gumerman)**

263.   The SEC realleges and incorporates by reference paragraphs 1-205 and 215-220 above.

264.   Defendants TMG, Tellone and Gumerman, acting with scienter, engaged in a scheme to defraud investors in the Mortgage Fund.  They concealed information from the Mortgage Fund's auditors concerning the Gumermans' bankruptcy and the discharge of the collateral for Loan #1415-06—giving the false impression that the loan was still outstanding for purposes of the Fund's fiscal year 2014 audit.  After the 2014 audit, Tellone and Gumerman entered a secret side deal that was concealed from the Mortgage Fund's auditors and that materially altered the terms of Loans #1415x-06 and Loan #1791-15, and created a conflict of interest between Tellone and the Mortgage Fund investors, most of whom were TMG advisory clients.  Tellone then hid the side agreement from the Fund's auditors and made misstatements in the management representation letters for the Fund's 2015-2017 audits, continuing to conceal the Gumermans' bankruptcy and the discharge of Loan #1415-06.  TMG continued to collect fees on the discharged loan.  Material information and about the side agreement was omitted from the Fund's 2014 financial statements and the conflict of interest not adequately disclosed in the Fund's offering memoranda or its Forms ADV.  In furtherance of the scheme, TMG offered a series of misleading, partial disclosures in the Fund's financial statements from 2015-2019; only when the side letter was discovered during an SEC exam did TMG in 2020 eventually disclose Tellone's conflicted agreement to personally reimburse the Gumermans for certain shortfalls to Fund investors, and even then, the Fund did not disclose all material facts.

265.   By engaging in the conduct described above, Defendants TMG, Tellone

and Gumerman, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

266.   Defendant TMG, Tellone and Gumerman, with scienter, employed devices, schemes and artifices to defraud; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

267.   By engaging in the conduct described above, Defendants TMG, Tellone and Gumerman violated, and unless restrained and enjoined will continue to violate, Securities Act Sections 17(a)(1) and 17(a)(3), 15 U.S.C. §§ 77q(a)(1), 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendants TMG and Tellone)

268.   The SEC realleges and incorporates by reference paragraphs 1-205 and 215-219 above.

269.   Defendants TMG and Tellone, acting with scienter or with negligence, made material misrepresentations to the investors in the Mortgage Fund, in the Mortgage Fund's financial statements, its offering memoranda, and its Forms ADV. In the Mortgage Fund's 2014 financial statements, TMG overstated its net income and its return on investment more than 40% by including income on Loan #1415-06, which several years prior had gone delinquent; then been written off in bankruptcy; and had its collateral foreclosed on.  In the Mortgage Fund's 2015 financial statements, TMG misleadingly portrayed the Mortgage Fund's impaired loans and related party transactions due to the existence of the side agreement.  Material

information about the side agreement was omitted from, and the conflict of interest not adequately disclosed in, the Mortgage Fund's offering memoranda or its Forms ADV.  By these statements, TMG and Tellone obtained compensation from the advisory fees paid by the Fund investors to TMG.

270.   By engaging in the conduct described above, Defendants TMG and Tellone, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

271.   Defendants TMG and Tellone, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

272.   By engaging in the conduct described above, Defendants TMG and Tellone violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

### FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of**

**Sections 17(a) of the Securities Act and**

**Sections 10(b) of the Exchange Act, and Rule 10b-5(a)-(c)**

**(against Defendant Wolfe)**

273.   The SEC realleges and incorporates by reference paragraphs 1-205, 215-219, and 221-228 above.

274.   Defendants TMG and Tellone, acting with scienter, engaged in a scheme to defraud and made material misrepresentations to investors in the Mortgage Fund. They concealed information from the Mortgage Fund's auditors concerning the

Gumermans' bankruptcy and the discharge of the collateral for Loan #1415-06—giving the false impression that the loan was still outstanding for purposes of the Fund's fiscal year 2014 audit.  Defendants TMG, Tellone and Gumerman, acting with scienter, engaged in a scheme to defraud investors in the Mortgage Fund, by concealing information from the Mortgage Fund's auditors concerning the Gumermans' bankruptcy and the discharge of the collateral for Loan #1415-06—giving the false impression that the loan was still outstanding for purposes of the Fund's fiscal year 2014 audit.

275.   Wolfe knowingly or recklessly provided substantial assistance to TMG and Tellone.  Throughout 2015, Wolfe knowingly provided false information about Loan #1415-06 to the auditors for the Fund's 2014 fiscal year audit and falsely certified the management representation letter to the Mortgage Fund's auditors.  Wolfe assisted with the backdated letter for the auditors, purporting to show that Loan #1415-06 was still outstanding, and concealed from the auditors the foreclosure of the loan's collateral by a senior creditor, which had a material impact on the Fund's 2014 financial statements.

276.   By reason of the conduct described above, Defendant Wolfe knowingly or recklessly provided substantial assistance to, and thereby aided and abetted TMG and Tellone in their violations of Sections 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), and Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(a)-(c), as prohibited by Section 15(b) of the Securities Act, 15 U.S.C. § 77o, and Exchange Act Section 20(e), 15 U.S.C. § 78t.

## SIXTH CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against Defendants TMG and Tellone)

277.   The SEC realleges and incorporates by reference paragraphs 1-201 and 206-219 above.

278.   Defendants TMG and Tellone, acting as investment advisers, breached their fiduciary duty to and deceived TMG advisory clients/investors in the Mortgage Fund and to the Mortgage Fund.  TMG and Tellone concealed information from the Mortgage Fund's auditors concerning the Gumermans' bankruptcy and the discharge of the collateral for Loan #1415-06—giving the false impression that the loan was still outstanding for purposes of the Mortgage Fund's fiscal year 2014 audit.  After the 2014 audit, Tellone and Gumerman entered a secret side deal that was concealed from the Mortgage Fund's auditors and that materially altered the terms of Loans #1415x-06 and Loan #1791-15, and created a conflict of interest between Tellone and the Mortgage Fund investors, most of whom were TMG advisory clients.  Tellone then hid the side agreement from the Mortgage Fund's auditors and made misstatements in the management representation letters for the Fund's 2015-2017 audits, continuing to conceal the Gumermans' bankruptcy and the discharge of Loan #1415-06.  Material information and about the side agreement was omitted from the Mortgage Fund's 2014 financial statements and the conflict of interest not adequately disclosed in the Mortgage Fund's offering memoranda or its Forms ADV.  In furtherance of the scheme, TMG offered a series of misleading, partial disclosures in the Mortgage Fund's financial statements from 2015-2019; only when the side letter was discovered during an SEC exam did TMG in 2020 eventually disclose Tellone's conflicted agreement to personally reimburse the Gumermans for certain shortfalls to Fund investors, and even then, the Fund did not disclose all material facts.  As TMG's president, founder, and sole owner, Tellone had ultimate authority for TMG's disclosures to its investors and TMG's advisory clients.  Further, by collecting fees on the discharged loan and issuing a new $1 million loan to Gumerman in furtherance of the scheme, Tellone and TMG misused the Mortgage Fund's assets, operating a fraud on the Mortgage Fund.

279.   By engaging in the conduct described above, Defendants TMG and Tellone, and each of them, directly or indirectly, by use of the mails or means and

instrumentalities of interstate commerce:  (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

280.   Defendant TMG and Tellone, with scienter, employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and with scienter or negligence, engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

281.   By engaging in the conduct described above, Defendants TMG and Tellone have violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of

### Sections 206(1) and 206(2) of the Advisers Act

### (against Defendant Wolfe)

282.   The SEC realleges and incorporates by reference paragraphs 1-201, 206-219, and 221-228 above.

283.   Defendants TMG and Tellone, acting as investment advisers, breached their fiduciary duty to and deceived TMG advisory clients/investors in the Mortgage Fund by concealing information from the Mortgage Fund's auditors concerning the Gumermans' bankruptcy and the discharge of the collateral for Loan #1415-06—giving the false impression that the loan was still outstanding for purposes of the Fund's fiscal year 2014 audit.  Material information and about the side agreement was omitted from the Mortgage Fund's 2014 financial statements.

284.   Defendant Wolfe knowingly or recklessly provided substantial assistance to TMG's and Tellone's violations.  Throughout 2015, Wolfe knowingly provided false information about Loan #1415-06 to the auditors for the Mortgage

Fund's 2014 fiscal year audit and falsely certified the management representation letter to the Mortgage Fund's auditors.  Wolfe assisted with the backdated letter for the auditors, purporting to show that Loan #1415-06 was still outstanding, and concealed from the auditors the foreclosure of the loan's collateral, which had a material impact on the Mortgage Fund's 2014 financial statements.

285.   By engaging in the conduct described above, Defendant Wolfe knowingly or recklessly provided substantial assistance to, and thereby aided and abetted TMG and Tellone in their violations of Sections 206(1) and 206(2) of the Advisers Act.  At all relevant times, Defendant Wolfe acted knowingly or recklessly in aiding and abetting TMG's and Tellone's Advisers Act violations.

286.   By engaging in the conduct described above, Defendant Wolfe aided and abetted, and unless restrained and enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2), as prohibited by Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

## EIGHTH CLAIM FOR RELIEF

### Violations of Advisers Act Section 206(4) and Rule 206(4)-7

### (against Defendant TMG)

287.   The SEC realleges and incorporates by reference paragraphs 1-201, 206-219, and 229-252 above.

288.   From at least 2015 through 2017, TMG lacked compliance policies and procedures reasonably designed to prevent violations of the Advisers Act.  TMG's compliance manual did not address the origination or modification of loans, nor how to mitigate conflicts of interests related to the Funds.  TMG also had no written policies and procedures in place requiring TMG to provide advisory clients invested in the Funds with adequate disclosures regarding conflicts of interests and related loan transactions, and provided that Tellone could clear any conflicts of interest.  The compliance policies had no provision for conflicts of interest created by Tellone himself, such as the side agreement with Gumerman, and no requirements for

conflicts to be disclosed to clients/Fund investors.

289.   Defendant TMG failed to adopt and implement written compliance policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules promulgated thereunder.

290.   By reason of the foregoing TMG violated and, unless enjoined, is reasonably likely to continue to violate Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Advisers Act,  Rule 206(4)-7, 17 C.F.R. § 275.206(4)-7.

### NINTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 206(4)**

**and Rule 206(4)-7 of the Advisers Act**

**(against Defendant Tellone)**

291.   The SEC realleges and incorporates by reference paragraphs 1-201, 206-219, and 229-252 above.

292.   From at least 2015 through 2017, TMG lacked compliance policies and procedures reasonably designed to prevent violations of the Advisers Act.  TMG's compliance manual did not address the origination or modification of loans, nor how to mitigate conflicts of interests related to the Funds.  TMG also had no written policies and procedures in place requiring TMG to provide advisory clients invested in the Funds with adequate disclosures regarding conflicts of interests and related party loan transactions, and provided that Tellone could clear any conflicts of interest. The compliance policies had no provision for conflicts of interest created by Tellone himself, such as the side agreement with Gumerman, and no requirements for conflicts to be disclosed to clients/Fund investors.

293.   Defendant Tellone knowingly or recklessly provided substantial assistance to TMG's violations.  As TMG's president, founder, and sole owner, Tellone has reviewed TMG's compliance manuals and acknowledged access to them. Tellone knew that he had engaged in an undisclosed side agreement that created a conflict of interest between him and the Mortgage Fund's investors/TMG's advisory

clients, and that TMG's compliance policies and procedures did not adequately prevent his fraudulent conduct.

294.   By reason of the foregoing Tellone aided and abetted, and unless enjoined, is reasonably likely to continue to aiding and abetting violations of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Advisers Act, Rule 206(4)-7, 17 C.F.R. § 275.206(4)-7, as prohibited by Advisers Act Section 209(f), § 80b-9(f).

## TENTH CLAIM FOR RELIEF

### Violation of Section 207 of the Advisers Act

### (against Defendants TMG and Tellone)

295.   The SEC realleges and incorporates by reference paragraphs 1-201 and 206-219 above.

296.   Section 207 of the Advisers Act, 15 U.S.C. §80b-7, provides that it is unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under Section 203, or to omit to state in any such application or report any material fact which is required to be stated therein.  A Form ADV is a registration application or report filed with the Commission pursuant to Section 203.

297.   As set forth above, Defendants TMG's and Tellone's filings on Forms ADV were materially false and misleading because they failed to disclose the actual conflict of interest arising from Tellone's side agreement with Gumerman.  As TMG's president, founder, and sole owner, Tellone signed TMG's Forms ADV before they were provided to Fund investors.

298.   As a result, Defendants TMG and Tellone violated and, unless enjoined, will continue to violate Section 207 of the Advisers Act, 15 U.S.C. §80b-7.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the

alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, as follows:

(a)     Permanently enjoining Defendants TMG, Tellone, Wolfe and Gumerman from violating Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) thereunder, 15 U.S.C. § 78j(b), and Rules 10b-5(a)-(c) thereunder, 17 C.F.R. §§ 240.10b-5(a)-(c);

(b)     Permanently enjoining Defendants TMG, Tellone, Wolfe and Gumerman from violating Section 17(a)(1)-(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1)-(3);

(c)     Permanently enjoining Defendants TMG, Tellone, and Wolfe from violating Sections 206(1)-(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2); and

(d)     Permanently enjoining Defendants TMG and Tellone from violating Sections 206(4) of the Advisers Act, § 80b-6(4), and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7; and from violating Section 207 of the Advisers Act, 15 U.S.C. § 80b-7.

## III.

Order Defendants TMG and Tellone to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## IV.

Order Defendants TMG and Tellone to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 31, 2021

*/s/Amy Jane Longo*
Amy Jane Longo
Yolanda Ochoa
Attorneys for Plaintiff
Securities and Exchange Commission